Case number 21-7138, Lartasha Kelly, appellant, v. Anthony Gaton, officer, District of Columbia Metropolitan Police Department and District of Columbia Municipal Corporation. Ms. Golden for the appellant, Mr. Garten for the appellate. Good morning, Ms. Golden. Good morning, Annalise. May it please the court. In response to a minor misdemeanor, a police officer with no warning tackled Ms. Kelly, who everyone agrees is a very small woman, less than half his size. At the time he tackled her, she had stepped back, the physical altercation had ceased, the two women were in fact separated by someone else. There was no danger to anyone else or the officer on the scene. She wasn't fleeing, she wasn't even aware that there were police in the vicinity. Yet by effectuating arrest with a full speed football tackle and cracking her pelvis, the officer on the scene violated the Fourth Amendment. In analyzing this situation, the district court made three mistakes of law that we believe require regrets. The first is that under the Fourth Amendment, a police officer cannot use, surprise, extreme physical force against a non-resisting misdemeanor. This poses no real physical danger to anyone. Second error is that this is clearly established under the case law. And the third error was in finding that the officer was not entitled to a qualified privilege for assault and battery under District of Columbia. On the clearly established question, can you name a case where a court has held excessive force when an officer tackled someone who had just three seconds for, struck another person repeatedly, and who was still screaming threats at the person, even after the strike, and who still had her guards up with regard to her posture? What's the closest precedent to that? There is no one individual case yet. That's clear, but the case law can create a synthesis. And I think there are several cases that taken together make that. The first that I would point to is Smith v. Wright, the Fourth Circuit case. In that, the Fourth Circuit analyzed the situation where at the beginning, the young woman that the officer was arresting pulled back, jerked back from the police officer, and found that he reacted to that potentially dangerous situation for a police officer, but reacted in overwhelmingly physical way. And in fact, escalated the capacity for violence, which is the case here. The second case I would point to is Young v. County of Los Angeles, in which the Ninth Circuit, like other sister circuits, emphasized that the significant use of force without any warning whatsoever was a problem under the Fourth Amendment. That's not always the case, right? I'm sorry? It's not always the case that there has to be warning. I understand that you have a reasonable argument here that there should have been warning. But if I'm about to shoot someone, the officer doesn't have to, you know, give me a verbal warning before he stops me from shooting. No, of course not. But Miss Kelly was nowhere near shooting someone. I agree. The key under the Fourth Amendment is a proportionality, as Graham, I think, made clear. Before you get to that, I'm confused by the record. What does the record show that guards up means? I just thought having your guard up means you're alert. I didn't think it had anything to do with posture, right? You're alert. You're acutely aware of your environment. But everyone seems to think in this record, or at least in the briefing, that guards up means something like hands up or ready to strike. I'm not aware of that terminology. What does the record say that means? Thank you, Your Honor. I think that the record is somewhat unclear. And that would be a material fact that we believe should go to the jury. Is there a dispute about it? What does Miss Kelly... Miss Kelly... I'm sorry, is it Lartasha or... Lartasha. L-A-R-T-A-S-H-A. There's two of them. L-A-R-T-A-R-S-H-A? Okay. All right, good. Thank you, because there's been some confusion about that. I'm sorry to interrupt with that. I want to make sure we have it right out of respect for her. Yeah, so tell me what she says guards up means, or where's the disputed fact? Miss Kelly described her position as one where her hand remained... I confess, Your Honor, I'm not a boxer. But where her hand remained up to block any blows, whereas her other hand was down. So she was still... And where does the record say that she had it up to block blows? I don't think she used that exact language. I'm sorry. Did she say it was up defensively or anything like that? She described it as defensively. I'm sorry, Your Honor. I don't have a record say it off the top of my head. I'd be happy to discuss that during my rebuttal time. That might be helpful, because it's just something that has very much confused me. But I didn't see anything particularly clarifying in her deposition other than that she had one hand up. And maybe that's what guards up... I'm not a boxer either, so I don't know what guards up means either. I had a more colloquial understanding of the phrase. What should we make of the police's procedures or policies in this case, in terms of any notice or awareness of the officer's duties in response? Thank you. While, of course, this court, or any court, doesn't defer to a policy in interpreting the Constitution, I think it is helpful to look to the District of Columbia's policies, where it explicitly said in describing Graham and the constitutional duties that an officer should attempt to work his or her way up the use of force continuum, and start with something like a command presence, followed by verbal warnings, moving to some amount of force, possibly more extreme physical force, like in this case, which would be appropriate in, say, the Dykes case, where the suspect was running, to the sorts of lethal force that might have to happen in a lethality situation. Can I switch gears a little bit and ask about the Battery claim, and in particular, how qualified privilege is or is not similar to qualified immunity under the 1983? Well, maybe I'll just start with this question. Do you view them as same or different? I view them as 99.9 percent the same, Your Honor, in the theoretical situation that we don't claim we have here. It is possible under District... Sorry, I just want to clarify that answer. Is this case in that 0.1 percent? No. No, I didn't know. No. This case is in the 99.9 percent. Yes, where it's coexistent. I'd like to reserve the rest of my time for rebuttal, but I'd also like to answer that question for Judge Walker. Please, go ahead and answer. It is theoretically possible that an officer could say, after a use of force, in a use of force report, I knew that was unconstitutional, but I did it anyway because I thought it was the right thing to do. And a court later determined that that was not unconstitutional. It was a constitutional, proportional use of force under the Fourth Amendment. That would still not be entitled to qualified privilege under the District of Columbia law because there's both a subjective and objective prong. But here, we have no evidence that the officer had said anything like that or thought. But the objective prong under District law is much narrower, right? For someone to be denied qualified immunity, you have to show both that they acted unreasonable, and it was unreasonable for them to think that they acted reasonably. So it's like a reasonableness squared. That is not the law in the District of Columbia. All it is is that first inquiry, the objective reasonableness inquiry. So I'm very curious about your 99% overlap because I see the D.C. Court of Appeals saying exactly the opposite. And, in fact, in cases recognizing that you can have even where an officer gets qualified immunity, they may not get qualified privilege. I'm really shocked at your answer, I have to say. Thank you, Your Honor. I think that that is a good point, and I'm sorry that I— No, no, I'm not asking you to apologize. Why is everyone apologizing today? It's your position. I'm just trying—and you're much more expert in this. I have not litigated in this area, so you're much more expert than me. So I was just a little surprised at the answer because it seems both as articulated, it's a different test, and the case law seems a different—and I had read your brief as saying that, you know, even if we lose underqualified immunity, we can still go forward with the tort case under qualified privilege. You are much more expert than me, so please— I don't know if you looked at—it seems to me, I looked at the Wesby case that— This court, Supreme Court, that's this court. And it seems like the plaintiffs there made a concession similar to the one that you've made here. I agree with—I asked you the question because I think the D.C. court's language on this is not as precise as the 1983 language has become over time. And so, you know, I think it is sort of an open question. I don't know if that's the right way to put it, but I think your position is not unprecedented. This is what I would say. Your Honor, the briefing didn't focus on that issue, and if the court would like more briefing, I'd be happy to provide some. All right, thank you very much. We'll give you a couple minutes for rebuttal. Okay, please, the court. Jeremy Gerten for the appellees. The arresting officer in this case did not use excessive force when he quickly performed a takedown maneuver on Ms. Kelly after witnessing her repeatedly strike her neighbor in the face and threaten to continue her assault. Can you answer my question about what the record says guards up means? Yes, Your Honor. So I think that's discussed at the court. In the district court's opinion at J135 and J128. And 128 cites the video taken at the hospital after, which is not in the joint appendix, but it is in the record in which she said that she had her guards up. And I think she actually motions and shows that she has her hands raised. That video is not in our record. It's not in the joint appendix, but it is in the district court's record. So I think it should be available to the court. But if if there's some difficulty with that, we can. Okay, that's helpful. Thank you. So even viewing all the disputed facts in Ms. Kelly's favor, the amount of force here was not objectively unreasonable under the circumstances. And even if the court found that it was questionable, the officer would still be entitled to qualified immunity because there is no clearly established law that would have prevented that. But would those dispute facts be more right for a jury question? I don't believe there are any material disputed facts that weigh on either the excessive force question or qualified immunity, Your Honor. Ms. Kelly identified three purported disputes of fact in her brief. The first was whether she had used a slap or a punch. And the district court, I think, correctly said that that wasn't material because it was an assault either way and assumed it was a slap for the purpose of this analysis. The second was about whether her threats were genuine. And I think, again, that's not a disputed fact in the sense that the threat is reported. There's no dispute about what she said. And her subjective intent isn't relevant when you're looking at the case from the perspective of the officer reacting to those threats. And given the heated altercation and the actual strikes that she made, I think it would be perfectly reasonable for an officer to assume those threats were genuine. And then the third is whether or not she had terminated the confrontation. And I think on that, the district court looked at the video and said, it's clear from the video that the altercation hadn't terminated. There might be some dispute about whether she took one or two steps backward, but the altercation was still ongoing. And I think that's quite clear, especially when you think about how little time passed between when she struck her neighbor. That could all justify some use of force. But you have to, you know, as long as we tick those boxes, any force is justified. You couldn't have shot her, right? No, we do. Right, so we have to then ask whether the force chosen made any sense in this context. Yes, Your Honor, you do. Is that a law question or a fact question or a mixed question? I think it's a law question, Your Honor, about whether or not the use of force was reasonable under the circumstances. And that's the totality of the circumstances test. But here there are facts infused with it. For example, he said he had to use his high school football tackle technique because he was afraid of being assaulted. But then the only evidence in the record he had for that was that she turned her head toward me. She turned, all she did with respect to you is turn her head. I'm reading from his deposition, yes. And you think that's presenting a fighting stance towards you? Yes. But a reasonable jury doesn't believe him, a big officer like him, that if a small woman turns her head, that's posing a risk of assaulting the police officer. I think a jury could certainly disbelieve his testimony that she even turned her head, but I think that wouldn't change the excessive force. Why do we also have a person who's right in the middle of them, too? If you add that fact on to what Judge Millett said. Yes, Your Honor, and we don't dispute that a gentleman stepped between, but I think we have to remember that the time between when she hit her neighbor in the face, she screamed her threats again and the officer intervened. And that all took three seconds. But in that same time, there was a gentleman standing in between them. And so the question is, he said he had to do the tackle because he didn't want to be assaulted. That's the rationale he gave for that technique. And if a jury could disbelieve, it's just unreasonable, almost unfeasible to think that an officer would consider that he was about to be attacked with this gentleman there in between them. And all she did was not her hands towards him, but her head towards him. And then isn't that how is it then reasonable to think that the really ferocious amount of force used? I mean, there were gasps and a curse word used in response to it by the people present. So why was that as opposed to grabbing her arms? But your honor, I think that his testimony, if I'm recalling his deposition correctly, was that the reason he didn't use an arm bar takedown or a different type of physical technique was because he didn't want to be assaulted. So I think that was context in which he made that statement. But again, this is a pretty chaotic scene. But it was just not credible that he was afraid of really being hurt by this woman so much so that he had to use a completely unauthorized technique. I just don't even understand that as an answer to why he couldn't really have just said freeze or grabbed her arm and pushed her to the ground with the one arm technique or just bear hugged her like he started before he tackled and stopped right there. She wasn't going to break out of a bear hug from him. Well, your honor, I think that it's the question isn't whether or not. In hindsight, another use of force would have been. No, I'm not. And I totally respect that. I completely get that point. But this is right there in the moment when this is not you know, they're not at each other's throat. They're separate. If they were at each other's throats, if there were any kind of weapon involved, all those there's so many factors that would be completely consistent with that theory. That isn't what we have. And this whole reason he says, I had to do this technique rather than something else. To be fair, he said pepper spray because everyone was close together so that we couldn't do pepper spray. I get that. But he then between pepper spray and this bear hug tackle fall on top of her. The only explanation he gives is I didn't want to get assaulted. And the only risk of assault he identifies is she turned her head towards. Well, I think the risk of assault is that she was actively assaulting another person. She wasn't actively assaulting anyone at the time. Well, if you if you review the video, the court can review it for itself. But she strikes her neighbor in the face. She's screaming vanities. She's obviously agitated and obviously agitated. Second decision. Right. I just think obviously agitated is different than actively assaulting somebody. Unless you're just talking about the assault of the words at that point, the threats. Well, she's continuing to say that she's going to beat up her neighbor even after striking her neighbor. So I think it is a real stretch to say that in that three second period that there had been a cooling off and that she was no longer posing a threat to anybody. I think that's a real stretch of what the video shows. I think we can agree she had not cooled off. Yes. So so I think that, you know. We also agree that those videos are pretty difficult to discern everything that's going on and even who is who, quite frankly. I think I agree it's a chaotic situation. No, no, no, no, no, no. That's not what I just said. I didn't say the situation was chaotic. I said the videos are quite grainy and difficult to discern a whole lot of anything other than you can see the gentleman stepping in between them. I agree that. I mean, it certainly was at night. It's difficult to make out all the details of the video. But I think that they do make clear that this was a heated altercation. They had just arrived on the scene. They'd been called to report of domestic violence. They witnessed someone, you know, screaming profanity, saying she's going to beat her up. And then she starts doing it. And then she says she's going to do it again. And I think it is reasonable for an officer in that circumstances to execute. To use force. Absolutely. Some level of some level. Are there any cases that talk about what happens when the use of force is one that's just not even authorized by the police department? I don't think I would agree that this use of force wasn't authorized to the police department. The Internal Affairs Division reviewed it and said that it was an acceptable use of force under the policy. Do they train them on tackles and full body tackles? I believe that Officer Gatton said that he was trained on tackle takedowns at the academy, as well as other forms of takedowns, including arm bars. Plenty of other forms of takedowns. I had thought the record was that this tackling thing was not something in the district. So the district trains people to train them on tackling. I believe that was his testimony, Your Honor. How does the expert report factor in? So the expert reports speak about both the constitutional standard and the internal policy. And what we're focused on here is the constitutional standard. So I'm not sure that they really shed that much light on that standard, which is just a legal one for the court. But as my colleague Golden talked about, they do talk about a continuum of force. But I would disagree that they say that officer must use less intrusive means first. Depending on the situation, they're certainly authorized to use force immediately if necessary. You know, you think about something like... But still proportional. Still proportionally, yes, Your Honor. But they don't have to exhaust all of the less intrusive options first. They can use the level of force that's appropriate under the circumstances. And district law acknowledges that anybody can use force to repel an assault, not just an officer. So I think that we're in a situation where the level of force used was reasonable under the circumstances. But even if there was... I just want to clarify one thing that I think I understand what you're saying is that the choice of force used was to stop the assault. It wasn't to effectuate the arrest. It was to stop the assault and then presumably the arrest would happen afterwards. Yes, Your Honor. So that was his testimony that he used the force he felt was necessary to stop the assault from continuing. And then the arrest happens immediately after. There's no additional force applied beyond handcuffing. Can I ask at what moment in time do we judge whether the officer made a reasonable decision to use the force he used? So I could imagine we look to the moment in time when the tackle happened. Or I can imagine we look to the moment in time a little bit earlier when the officer decided to make the tackle. I think it's the latter, Your Honor. And to the extent I think it's even difficult to say that those are really even separate in time because it's so quick. They're separated in three seconds. Three seconds. But I think it's the moment he makes the decision. What's your support? So I guess I'm not aware of a case where you have kind of that potential delta in time. But you're looking at the officer's reasonableness in the decision that he's making. So I think it would be natural to focus on the time when he made the decision. Well, wait a minute. Someone says drop the gun. And that only takes probably less than three seconds. And the person does drop the gun. And it's still OK for the officer to shoot him because he made the decision before that command was issued to shoot him? Because he was about to shoot someone else? I think it would be inconsistent to say that he made the decision. Sorry, Your Honor. Don't we have to look at the time they actually applied the force? Because things can change quite materially. Would it be OK to shoot someone after they've dropped the gun? No, Your Honor. But I think that the statement... Even if they decided to shoot them before they dropped the gun. Well, I think that hypothetically opposed was that he issued a command. No, no. Someone else says drop the gun. He's about to shoot this person. He's like, I've got to shoot him. As he's thinking that, someone else is shouting drop the gun. The guy drops the gun. He's already made the decision. I think in that circumstance, if a different officer was shouting a command and the officer didn't have time to change his decision, then yes. I didn't say he didn't have time. The gun's dropped. He's got time. You're telling me which time we look at the decision. And that seems to me quite an extraordinary position on the part of the government. Because it would say, in my hypothetical, it was OK to go ahead and shoot him after the gun was dropped. Well, I think, as I understood the hypothetical, it was that there was a decision made to fire. There was a delay during which someone instructed someone to drop the gun and the gun is dropped. Yeah, that same delay is happening while he's getting his gun out. I'm going to have to shoot this person. Same second someone says drop the gun and he drops it. By the time he gets it up here, it's dropped. I mean, I think that would be a difficult hypothetical to say that the decision had already been made and it shouldn't have been changed in that interim. Here, I think it's a little bit different in that the officer is running. Mr. Gruden, this is not a perfect analogy to the tackle, so I'm not pretending it is. Do you watch baseball ever? Totally, your honor, yes. Ever seen a batter swing at a pitch that's way out of the strike zone by the time it crosses the plate? Yeah. Because the decision to swing is made a little bit before the time when he actually would make contact with the ball. Now, I'm not saying it's a three second delay like in this case. Maybe this case is more analogous to the shooting of the gun thing. But it does seem like the only thing we can ask an officer to do is make a right decision at the time that we would expect the officer to begin the movement of the tackle. I think that's right, your honor. I think the video evidence shows that because both officers began running the moment that Ms. Kelly began striking her neighbor. And so I think that's pretty clear when the decision was made. And the only issue is whether in those three seconds there was a sufficient change in circumstances that would have, as a constitutional matter, required him to stop or change his behavior or change his decision. And I just don't think that there was sufficient time. The attack stops and they're separated by another person. That's not enough of a material change. I don't think it is, your honor. I think because she was still posing a threat to other individuals, she was still cursing and saying she was going to beat her up. And the confrontation hadn't ended. So I don't think there really was a material change. But even if the court was concerned about that, I think we would still be in the land of qualified immunity. And the court asked Ms. Golden, you know, what's the case? And she wasn't able to provide you one that's remotely similar to a circumstance like this, where the officers witness an assault that's essentially ongoing. I mean, perhaps the court would say that there's some dispute about that, but it's almost immediate. And there's just no case like that in this circuit or any other. So we would still be in the land of qualified immunity. A couple of questions. One is, it was asked earlier about distinctions between qualified immunity and the qualified privilege. You want to speak to that? Yes, thank you, Judge Charles. I think that Ms. Golden has always presented in her briefs that in terms of the objective prong of the district's test, that they rise and fall together in this case. And I think she reaffirmed that view here. I think we all agree that there is a subjective prong as well. And that prong has never been contested in this case. So our view is that they would rise and fall together. And I think in response to Judge Millett, your question about, you know, is there a difference on the objective prong? There isn't. Jenkins speaks about this. And it says that there's two ways for the objective prong to be analyzed. One is that there's no constitutional violation. So that's the same as in the qualified immunity test. And the second is whether the officer reasonably could have understood what they were doing. I'm sorry, Jenkins is a DCCA case? Yes, that's a DCCA case, Your Honor. Jenkins versus? So we cited it in our brief. Oh, I got it. 223884. And so it describes it very similarly to the qualified immunity analysis. That you can have qualified immunity simply because you didn't violate the Constitution or because a reasonable officer would have thought. That was a false arrest case, not an excessive force one. And the DCCA has already said those are the same, but has not. In fact, it said there is indicated they're different. And the scales case, I think, when it comes to reasonableness of force. Because you've got the reasonableness squared under the qualified immunity that you don't have under DCCA. I think I would respectfully disagree. I think you do have the reasonableness squared in the district's qualified privilege standard. Because that's what Jenkins says. No, they said that for false arrest. And they've said their false arrest standard is nearly identical. Because you've got the whole probable cause thing going on. It's nearly identical to the federal one. But they have not said that for excessive force. They've said the opposite. There can be different constitutional standards for different issues. And some of them can be the same. They end up getting applied in some different. So Jenkins doesn't speak to excessive force being the same. It doesn't, Your Honor. But I do think it generally speaks about qualified privilege. And if you look at how the court analyzed privilege in that case. It said we're not going to decide if there was a constitutional violation. But we're going to hold that it was reasonable. I think it was a pat down in that case. And said there was no clear rule that would have put the officer on notice. And I think that's very similar to the qualified immunity analysis. When we're looking at constitutional violations. You've got to look at it for Fourth Amendment. Still with the 1983 claim. And then qualified immunity. But then you're also looking at constitutional violation for battery. How are we approaching that? You said law on the Fourth Amendment violation. But what about whether or not it's a legal question on the battery issue? Your Honor, the District of Columbia battery claim. Essentially mapped onto the Fourth Amendment analysis here. Because the analysis would be that an officer commits a battery. Unless it didn't violate the Fourth Amendment in doing so. Or under the Jenkins qualified privilege test. It would be reasonable for an officer to think they were complying with the Constitution. Under either of those circumstances. You would find that there was qualified privilege. But I don't think there's really any delta between the two claims at issue here. And I don't think Ms. Kelly's ever argued that there should be a difference. In how the claims are treated here. Unless the court has. I just had one more. Because JA 120. This is the government's filing the response. A football style tackle was not taught as a take down technique at the DC Police Academy. During the time Officer Gatton was there. I was trying to reconcile that. I think maybe I misheard or misunderstood what you were saying. I thought you said that this was a technique you would have learned at the Academy. I think that the issue. I think that the reason why we did not dispute that statement. Is I don't think we would have agreed with the football style language used there. But the take down technique. I think that he used was part of the Academy. I believe it was his testimony. I'm sorry. It just has a different name at the Academy. What's it called at the Academy? Follow take down. Which is how he described it in his testimony. You just completely jump on somebody and flatten them to the ground. I think you use kind of the bear hug style technique that he described. And? And then they go to the ground. But I think we objected to the football style. Because I don't think that that's an accurate representation. I think that's a rather misleading answer then is it not? We teach exactly the same technique. We just don't call it that. I think that's very different than saying. His football style takedown is not something taught at the Academy. Well, I don't think we said this. The statement is a football style. Takedown is what was a statement. I said we were disputing. I think that's probably the reason here. Football style tackle. I don't believe we would describe it that way. But that's how your officer described it. And so I'm sorry. So this was all just a fight about words. But you in fact the DC Police Academy teaches and approves of. This exact technique. I believe that's correct, Your Honor. Where's that in the record? I believe that was in his deposition testimony. Was that he used a solo takedown maneuver that he. Had been taught at the Academy. Where's that in his deposition? I don't have the exact record citation in front of me, Your Honor. But there's. It looks like. Officer Kip Cotton received 40 hours of instruction on takedowns while at the Academy. Which is, you know, not. Then the next question is. This is. Sorry, I don't have a J.A. number. But football style was not taught. Was not taught. At the Academy. So a tackle was taught football style tackle. I think the objection was the football style language, Your Honor. What other kind of tackle is there? You said the bear hogging down, which is exactly what he did here. So I'm understanding. If it is the exact same technique technique that he applied here. Yes, I mean, I don't think I don't think there's a dispute about that, but I think that. It's over the language football style that was introduced by the attorney in the government. It was just didn't like the label, but the exact same motions and technique are exactly what they approve and authorize and train people on. Well, I think, Your Honor, if this was not an approved technique, I think it would have been noted in the internal affairs department. Which wasn't so. I think it is reasonable to understand that it is tough. But that's not even the answer. I'm sorry, you're making the inference from the IAD conclusion that it's an off. It is a trained and authorized technique. I think if it weren't, then the IAD would have noted that. And I think that's ultimately this is kind of all the side of the constitutional question of whether this was reasonably use of force under the circumstances. That's not entirely mapped onto the internal policy. But even to get to the constitutional question, was the district court in terms of getting it to a matter of law and then granting summary judgment and kicking the case out? Having to weigh credibility determinations or making certain inferences that really are factual? I don't think so, Your Honor. And I would respectfully go back to the Graham factors, which I think talk about the severity of the climate issue. That's not disputed. That is disputed. The severity of the climate issue? Yes. Famous believes it's a lesser form of assault in terms of what the two people were doing. Well, I mean, that might be her position, but I don't think that a reasonable officer on the scene would have been able to make a distinction like that. I mean, we granted to her that, you know, for the purposes of no weapons of any sort. Right. I don't think that's disputed. No blood. The person didn't even fall down, didn't cry out. Minimus injury. All of those facts would have been known after the incident. No, at the time. They weren't even running at this point. This is what happens when she's laughing. Well, I think given the amount of time that this incident took, it would be difficult for an officer to have assessed whether Ms. Sims was bleeding or injured or any of those facts wouldn't have been known within the three second time frame we're talking about here. But we said for the purpose of summary. There was no actual observation that they were there. Those facts did exist. No, I think he just observed that she was striking the neighbor in the face, that it was a heated confrontation, that there were that she was screaming and swearing. And that's what that's the information he had available to him at the time. But I think if there are any questions about whether the use of force here was reasonable, I still think we have a problem with qualified immunity where you don't have any case that would have put an officer on notice. If the court wants to establish that case law here, it could do so. But it would be the first time that this court has ever said that this type of force would have been unreasonable on notice. You don't want us to do that? No, Your Honor, because we don't. We don't. If you were being slapped twice and then someone was saying after she slapped you, I'm going to beat the blank out of you. Blank. And only three seconds passed. Would you want the officer to tackle the person? Of course, Your Honor. And I think that that was part of his job. To tackle a person or just to stop the person? In this, I don't think there's really a way to make a distinction between that. The victim might want you to shoot that person. I might want you to shoot that person. I don't think that anyone contends that that would have been a reasonable response, Your Honor. But I think that pulling her away with a bear hug tackle and taking her to the ground for a takedown would have been an appropriate response. And even if there was some question, I think you would have to reexamine some of this court's prior cases about takedowns in which far less violent and severe crimes were met with a similar response. And the court said that there wasn't Fourth Amendment violence. Is the officer allowed to entertain the possibility that the attacker is armed? I'm not. Or is it? We now know she wasn't. So do we have to do we have to pretend the officer was 100 percent sure she was not? I don't think you have to pretend that, Your Honor. I think he agreed that he didn't see any weapon when he made his decision. But the situation unfolded so quickly, I don't think that it would be necessarily clear to an officer that the fight wouldn't escalate further. And so I think he was reasonably responding and saying, I need to intervene and stop this right now before it does escalate. Unless the court has any further questions. Thank you. The case is not submitted. We have rebuttal time. Excuse me. Ms. Golden, we'll give you two minutes. I first wanted to clarify that the record site for Ms. Kelly describing what she had done was A78. Where in her deposition where she says she had pulled back. I agree, though, this is one of many areas that require more factual development. And that this is exactly why this case was not proper for disposal on summer protection. And that you needed full testimony and a fact finder, a jury, to figure out what happened. I'd also like to highlight the point of the officer's reaction in the three seconds. And point out that this court's case in life versus D.C. made very clear that, although that was a lethal use of force, that a use of force permission only exists for as long as the threat exists. And here, Ms. Kelly had stepped back. There was another gentleman between them. Everybody else around reacted as if there was not need to take her down with what we would, in fact, characterize as a football style attack. If there are no further questions. Thank you very much. Now the case is submitted.
judges: Millett, Walker, Childs